IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| **GLYN BOOTH** | **PLAINTIFF** |
| V. | **CIVIL ACTION NO.: 3:14-cv-918-WHB-JCG** |
| **WAL-MART STORES EAST, LP** | **DEFENDANT** |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Glyn Booth, is a former Market Manager of Wal-Mart Stores East, LP ("Wal-"Mart" or the "Company"). After Mr. Booth voluntarily resigned from employment in August 2013, he filed an EEOC charge and lawsuit against Wal-Mart alleging race discrimination, hostile work environment based on race, retaliation, and constructive discharge. As Wal-Mart will show, there are no genuine disputes as to any material facts concerning Mr. Booth's claims. Therefore, judgment as a matter of law in Wal-Mart's favor is warranted.

**I.  STATEMENT OF FACTS[1]**

In May 2010, Wal-Mart hired Mr. Booth, an African-American, as a Market Manager. **ECF No. 3**. At the time of his hire, Mr. Booth had no prior experience in the retail industry. **Exhibit 1, pp. 24, 50**. Initially, Diana Gardner supervised Mr. Booth. **Exhibit 1, p. 52**. After her promotion, Sammy Sappington assumed the role of Regional General Manager in December

---

[1] This section is primarily derived from Mr. Booth's Complaint and deposition testimony, and is offered for the sole purpose of Wal-Mart's Motion for Summary Judgment. Wal-Mart reserves the right to challenge any fact at a later date.

1

2011 and became Mr. Booth's supervisor. **Exhibit 2**.[2] Mr. Sappington's responsibilities include, among other things, overseeing all markets within the State of Mississippi. **Exhibit 2**.

After he was hired, Mr. Booth received training through Wal-Mart's computer-based learning programs. **Exhibit 3**. Mr. Booth also received training for the position under Mr. Sappington's direction in 2010 and prior to Mr. Sappington assuming the Regional General Manager's position. **Exhibit 2.** Mr. Booth was also trained on Wal-Mart's Anti-Discrimination and Harassment Policy and Open Door Policy. **Exhibit 4; Exhibit 1, pp. 85-86**. Additionally, Mr. Booth testified that he had access to "people that he needed to talk to" and "vent to," as needed. **Exhibit 1, p. 86**.[3]

As a Market Manager, Mr. Booth was assigned to Market 140, which covered the metro-Jackson and Vicksburg areas. **Exhibit 2**. This Market is considered one of the highest profile markets in the State of Mississippi due to its size and volume. **Exhibit 1, p. 97; Exhibit 2**. As a Market Manager, Mr. Booth was responsible for meeting performance standards for the stores he supervised and holding Store Managers accountable for their performance. **Exhibit 1, p. 70; Exhibit 6**. Mr. Booth would do this by visiting stores, issuing coaching notices, and occasionally placing Store Managers on Performance Improvement Plans ("PIPs"). **Exhibit 1, p. 69**. Mr. Booth's supervisors, such as Mr. Sappington, would also visit stores within the Market and communicate deficiencies to Mr. Booth for resolution.

---

[2] Mr. Sappington's Declaration attached to Defendant's motion for summary judgment contains Mr. Sappington's electronic signature. At the time of the filing of the motion, Mr. Sappington was out-of-town on business travel and he was unable to personally sign his Declaration prior to filing. Mr. Sappington is due to return home on Friday, August 14, 2015, at which time he will personally sign his Declaration. Counsel will then move to substitute Mr. Sappington's personally signed Declaration for the Declaration that contains his electronic signature.

[3] Additionally, as reflected in Mr. Booth's Associate History Profile (**Exhibit 5**), Mr. Booth took four training courses offered by Wal-Mart during 2011.

2

During his tenure as a Market Manager, Mr. Booth was coached multiple times for performance. On May 15, 2012, Mr. Booth was placed on a PIP, which identified various performance issues. **Exhibit 7**. Mr. Booth complained internally about the "vague" content of the PIP, and the PIP was ultimately withdrawn. **Exhibit 1, pp. 86, 93-94**. Mr. Booth never complained that he was placed on the May 2012 PIP because of his race. **Exhibit 1, pp. 89-90**.

On February 6, 2013, Mr. Booth received a First Written Coaching for job performance due to stocking and customer service issues in Store 1710. **Exhibit 8**. Mr. Booth acknowledged there were problems with "out-of-stocks"[4] in that store and that if the front-end was backed up (i.e., there were not enough registers open), it would be a problem for customers. **Exhibit 1, pp. 99-100, 102**. Believing this coaching was unfairly issued, Mr. Booth contacted the Business Unit Vice President for Human Resources to complain. **Exhibit 1, p. 106**. At no point did Mr. Booth state or even indicate that he believed the February 2013 coaching was issued to him because of his race. **Exhibit 1, p. 106**.

On March 19, 2013, Mr. Booth was again placed on a PIP.[5] **Exhibit 9**. The second PIP identified additional performance issues. Mr. Booth testified that he disagreed with the second PIP and believed it was issued because he utilized the Open Door Policy to complain about the February 2013 coaching that he received. **Exhibit 1, pp. 110-11**.

---

[4] In essence, "out-of-stocks" means that there is no product of a certain type on the shelves for customers to purchase. **Exhibit 2**. Mr. Booth acknowledged that it was his responsibility to ensure there was product available for Wal-Mart's customers and "out-of-stocks" would be a problem. **Exhibit 1, p. 101**.

[5] Mr. Booth contends there was an additional PIP between the May 2012 PIP and the March 2013 PIP, but that it was withdrawn after he utilized the Open Door Policy. **Exhibit 1, p. 106**. Mr. Booth was only placed on two PIPs, however. **Exhibit 2**. But, even if Mr. Booth was placed on a third PIP, he acknowledges it was withdrawn. Therefore, Wal-Mart will not analyze its impact on Mr. Booth's discrimination claims.

3

On May 7, 2013, during the first follow-up for the March 2013 PIP, continued performance issues were noted and Mr. Booth was rated as "below expectations." **Exhibit 10**. On May 24, 2013, Mr. Booth was issued a Second Written Coaching for job performance due to issues at Store 903. **Exhibit 11**. Specifically, Mr. Booth was coached because of the long lines and inadequate staffing levels at that store. At his deposition, he acknowledged there was a need for additional cashiers in Store 903. **Exhibit 1, p. 115**. Mr. Booth also testified that he issued a coaching to the Store Manager of that store due to the issues noted in the coaching he received. **Exhibit 1, p. 117**. Finally, on June 17, 2013, Mr. Booth received a Third Written Coaching, due to his failure to meet the expectations outlined in his PIP. **Exhibit 12**.

Because of his continued performance issues and the lack of retail experience prior to becoming a Market Manager, Mr. Sappington recommended that Mr. Booth step down to a Store Manager position in order to get experience at the store level.[6] **Exhibit 2**. Mr. Booth declined Mr. Sappington's recommendation. **Exhibit 2**. Nonetheless, Mr. Booth recognized that Market 140 may not be the Market for him. **Exhibit 1, p. 97**.

On August 23, 2013, Mr. Booth submitted a letter of resignation to Mr. Sappington. **Exhibit 13**. In his letter, he thanked Wal-Mart for the opportunity and indicated his last day of work would be September 6, 2013. Wal-Mart processed his separation as "Voluntary Termination for Career Opportunities" and categorized him as "rehirable." **Exhibit 14**. Mr. Booth began working as a District Manager for Bath & Body Works in September 2013. **Exhibit**

---

[6] At his June 17, 2015 deposition, Mr. Booth initially denied that he was given the opportunity to step back and become a Store Manager. **Exhibit 1, p. 18**. Later, he acknowledged that Mr. Sappington may have extended that invitation to him. **Exhibit 1, p. 49**. Mr. Booth also testified that Mr. Sappington was supportive of him obtaining alternative employment within Wal-Mart – even another Market Manager position – but that Mr. Sappington did not believe he was suited for Market 140. **Exhibit 1, p. 50**.

4

**1, pp. 8-9**. Mr. Booth received a job offer from Bath & Body Works on August 13, 2013, and he accepted the offer on August 23, 2013 – the same day that he submitted his resignation notice to Mr. Sappington.[7] **Exhibit 15; Exhibit 16**.

On February 10, 2014, Mr. Booth filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and received his notice of suit rights on August 28, 2014. **Exhibit 18; Exhibit 19**. Mr. Booth instituted this lawsuit on November 26, 2014 under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.[8] **ECF No. 1**. Mr. Booth contends he was discriminated against by Jerry Spencer, Senior Vice President of Operations, and Sammy Sappington, Regional General Manager, because of his race. **Exhibit 1, pp. 12-13**. He also contends he was subjected to a racially hostile work environment, retaliated against, and constructively discharged. **ECF No. 3**. At his deposition, he testified that he did not believe that he suffered any acts of discrimination prior to Mr. Sappington assuming a supervisory role over him in December 2011. **Exhibit 1, p. 53**.

## II. LAW AND ARGUMENT

### A. Standard of Review.

Wal-Mart incorporates the summary judgment standard articulated by this Court in *Homebuilders Ass'n of Miss. V. City of Brandon*, 3:07-cv-716-WHB-LRA, *8-9 (S.D. Miss. June 10, 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

### B. Mr. Booth's claim for race discrimination fails because he is unable to show that similarly situated employees outside of his protected class were treated more favorably than he was treated.

---

[7] Mr. Booth applied for the position with Bath & Body Works on July 3, 2013. **Exhibit 17**.

[8] Mr. Booth subsequently amended his Complaint. **ECF No. 3**. Claims under § 1981 are analyzed under the same framework as claims under Title VII. *See, e.g., Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503 (5th Cir. 2014) (discrimination claim brought under section 1981 is analyzed pursuant to Title VII framework).

5

A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 219 (5th Cir. 2001). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 310 n6 (5th Cir. 2004) (*quoting Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir. 2002)). Mr. Booth does not and cannot set forth any direct evidence of discrimination.

In the absence of direct evidence, Mr. Booth must use the circumstantial evidence method of proof. Circumstantial evidence of discrimination is considered under the well-known burden-shifting framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Initially, a plaintiff must establish a *prima facie* case of race discrimination. The elements of the ordinary *prima facie* case are: (1) the plaintiff belongs to a protected group; (2) he was qualified for his position; (3) he was terminated or suffered an adverse employment action; and (4) the company replaced him with a similarly-qualified employee who was not in the same protected class, or treated similarly-situated employees who were not in the same protected class more favorably than it treated him. *Ward v. Bechtel Corp.*, 102 F.3d 199, 201 (5th Cir. 1997); *Smith v. Wal-Mart Stores, Inc.*, 891 F.2d 1177, 1179 (5th Cir. 1990).

Once a plaintiff articulates a *prima facie* case, the burden shifts to the employer to identify a legitimate, non-discriminatory basis for the adverse employment action. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011). If an employer is able to satisfy that burden, then the plaintiff is required to prove either that the employer's reason is false (i.e., that it is a pretext for discrimination), or that the employer's reason, while true, is only one reason for its conduct and another motivating factor is the plaintiff's protected characteristic. *Id.*

6

FPDOCS 30934382.1

Mr. Booth contends that Caucasian Market Managers were not coached or placed on PIPs by Mr. Sappington despite experiencing similar performance issues, that Caucasian Market Managers received more training than he did, and that his stores were visited more frequently than the stores of his Caucasian counterparts.[9]

### 1. Mr. Booth cannot show that Caucasian Market Managers were treated more favorably in terms of discipline.

Mr. Booth first alleges that two Caucasian Market Managers – Ted Parks and Brad Sullivan – were treated more favorably than he was treated under similar circumstances. Specifically Mr. Booth contends that stores within their respective markets experienced performance issues similar to stores within his Market, but that neither Mr. Parks nor Mr. Sullivan was counseled or placed on a PIP. **ECF No. 3; Exhibit 1, pp. 58-59**. In support of his contention, he offers only "general knowledge" as to alleged disparate treatment. **Exhibit 1, pp. 58, 143**. In fact, he testified that he did not "100 percent know" whether Mr. Parks and Mr. Sullivan were counseled or placed on a PIP due to the results of store visits.[10] **Exhibit 1, p. 79**.

---

[9] Mr. Booth appears to contend he was also denied a bonus in 2013 for his performance in 2012. **Exhibit 1, p. 19**. To the extent Mr. Booth did not receive a bonus, it was due to his substandard performance during 2012. **Exhibit 2**. When Mr. Booth was asked to identify any comparator whom he alleges had substandard performance but received a bonus, Mr. Booth identified Bobby Shumpert, an African American. **Exhibit 1, p. 129.** Since Mr. Shumpert is also African American, Mr. Booth cannot point to Mr. Shumpert as a valid comparator under the Title VII disparate treatment analysis. Additionally, Mr. Booth alleges that he did not receive other employment within the Company. Mr. Booth testified, however, that Wal-Mart had legitimate reasons for declining to extend him job offers for other positions. These reasons ranged from his reluctance to move to California, the fact that the other applicants had more merchandising and Wal-Mart experience, lack of "home office experience," and the lack of open positions that suited his qualifications. **Exhibit 1, pp. 32, 34-35, 37, 39**.

[10] Despite his initial testimony, Mr. Booth testified toward the end of his deposition that he knew Mr. Parks was placed on a PIP and then took a step back to a Store Manager position in another state. **Exhibit 1, p. 142**.

7

As part of Mr. Booth's initial burden, he is required to demonstrate that persons outside of his protected class were treated more favorably under similar circumstances. In an attempt to do that, Mr. Booth speculates that two Caucasian Market Managers – Mr. Parks and Mr. Sullivan – were not counseled, disciplined or placed on a PIP despite the fact that stores in their respective markets were allegedly performing below standards. Although Mr. Booth cites "general knowledge," he admits that he is uncertain whether his allegations are in fact true. It is well-settled that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment." *Douglass v. United Servs. Auto Ass'n.*, 79 F.3d 1415, 1429 (5th Cir. 1996).

More importantly, however, is that Mr. Booth's allegations are untrue. While Mr. Sullivan has not been disciplined for the performance of stores in his Market, such discipline has not been warranted as the stores within his Market consistently operated at or above the performance standards. **Exhibit 2**. With regard to Mr. Parks, Mr. Sappington placed him on a PIP on August 1, 2013. **Exhibit 2; Exhibit 20**. In his PIP, Mr. Parks was coached partly for below-standard stores in his market. Thus, Mr. Booth fails to make out a *prima facie* case as he is unable to demonstrate that Caucasian Market Managers were treated more favorably in terms of discipline under similar circumstances.

But, even if he could make out a *prima facie* case, Mr. Booth's discrimination claim still must fail as Wal-Mart had a legitimate, non-discriminatory reason for issuing the various coachings and for placing Mr. Booth on the two PIPs, as more fully explained above.[11] While Mr. Booth disagrees with the coachings and the PIPs, he cannot proffer any evidence to

---

[11] *See* Section I: Statement of Facts, *supra*. At least to a certain extent, Mr. Booth even agreed with Mr. Sappington. Mr. Booth testified that, as it concerns the May 2012 PIP, Mr. Sappington was simply holding him accountable to Wal-Mart's standards. **Exhibit 1, p. 95.**

8

demonstrate that Wal-Mart's non-discriminatory reasons for issuing them are unworthy of credence or that Wal-Mart was at least partly motivated by the fact Mr. Booth is African American. In fact, Mr. Booth admitted that he did not believe the implementation of the May 2012 PIP was an act of racial discrimination. **Exhibit 1, pp. 93-94**. He also admitted that he did not believe the February 2013 counseling was issued because of his race. **Exhibit 1, p. 103**. Rather, Mr. Booth admitted that he was upset over being coached by Mr. Sappington. **Exhibit 1, p. 103**. Regarding the March 2013 PIP, Mr. Booth admitted that he simply thought the PIP was "unfair" and that it was issued to him because Mr. Booth had previously utilized the Open Door procedure to complain about his February 2013 coaching. **Exhibit 1, p. 110.** Because Mr. Booth has failed to offer any evidence of pretext, his race discrimination claim – as it concerns PIPs or other counseling issued to him – must fail.[12]

### 2. Mr. Booth cannot show that Caucasian Market Managers were treated more favorably in terms of training.

Mr. Booth testified that he did not receive adequate training to perform the duties of the Market Manager position, unlike his Caucasian counterparts. **Exhibit 1, pp. 54-57**. He testified that he received no formal training, but alleged that a Caucasian Market Manager in Tennessee received several months of concentrated training where she shadowed another Market Manager. **Exhibit 1, pp. 50-51, 55-56**. Mr. Booth later acknowledged that Mr. Sappington had no

---

[12] Notably, during Mr. Booth's tenure as the Market Manager of Market 140, he issued PIPs to the following Store Managers under his supervision: Luke Gleason, Roger Washington, Charles Hill, Eddie Robinson, Harry Horton, and Melvin Stubbs. The PIPs were issued by Mr. Booth based on the performance and conditions of the stores managed by each Store Manager. Mr. Booth testified that the issuance of PIPs to these Store Managers by him was proper and warranted. **Exhibit 1, pp. 144-145.**

supervisory authority over that Market Manager.[13] **Exhibit 1, pp. 61-62; Exhibit 2**. Mr. Booth offered no other example of Caucasian Market Managers under the supervision of Jerry Spencer or Sammy Sappington who were treated more favorably in terms of training.[14]

Despite Mr. Booth's contention that he received no formal training, the opposite is true. Mr. Booth was trained through Wal-Mart's computer-based learning programs. **Exhibit 1, p. 84; Exhibit 3**. Mr. Booth also trained under Mr. Sappington's supervision prior to Mr. Sappington assuming the role of Regional General Manager in December 2011. **Exhibit 2**. Also, as reflected in his Associate History Profile, Mr. Booth took four training courses in 2011. **Exhibit 5.** The training Mr. Booth received was no different than the training any other Market Manager in Mr. Sappington's region received. **Exhibit 2**. In fact, Mr. Sappington suggested to Mr. Booth that he should step down to a Store Manager position in order to get more experience running a store, similar to what Mr. Sappington offered Mr. Parks. **Exhibit 2**.

Thus, it is clear that Mr. Booth's Caucasian counterparts were not treated more favorably than he was in terms of training. But, even if Mr. Booth could make this showing, he has not alleged that he suffered an adverse employment action as a result of the purportedly inferior training. He does not contend that the discipline and coachings he received were due to inadequate training, and he contends that his separation from employment was due to intolerable

---

[13] Therefore, the Market Manager in Tennessee is not similarly situated such that Mr. Booth could point to her as valid comparator and as part of his *prima facie* case.

[14] Although Mr. Booth began working under the general supervision of Diana Gardner in 2010 and prior to Mr. Sappington assuming the role in December 2011, Mr. Booth testified that the only persons whom he believes committed acts of racial discrimination or harassment towards him are Jerry Spencer and Sammy Sappington. **Exhibit 1, pp. 12-13.**

conditions, which he has not attributed to his training. As a result, his discrimination claim – as it concerns the alleged training shortcomings – cannot survive summary judgment.[15]

### 3. Mr. Booth cannot show that Caucasian Market Managers were treated more favorably in terms of store visits.

Mr. Booth suggests that the frequency and timing of Mr. Spencer's visits to stores within his Market constituted discrimination. **Exhibit 1, pp. 62-63**. Specifically, Mr. Booth testified that Mr. Spencer would visit his stores often "at the most opportune times to see a store in its worse [sic] state." **Exhibit 1, p. 63.** Typically these visits were unannounced, though Mr. Booth testified this was "not necessarily" an act of discrimination because "we are known to do unannounced visits" and he would visit his own stores unannounced. **Exhibit 1, p. 64**. In support of the notion that Mr. Spencer was visiting stores in his Market more frequently than other stores in other markets, Mr. Booth again only pointed to "general knowledge." **Exhibit 1, p. 63**.

Mr. Booth offers nothing to show that Caucasian Market Managers were treated more favorably in terms of store visits – just "general knowledge," which does not save a plaintiff from summary judgment. *See Douglass*, 79 F.3d at 1429. But, even if this general knowledge were enough, Mr. Booth's supervisors had legitimate, non-discriminatory reasons for visiting Mr. Booth's stores – regardless of frequency. **Exhibit 2**. Simply put, stores that are underperforming warrant additional attention from upper management. While Mr. Spencer and Mr. Sappington may have had high expectations for Mr. Booth and the stores within his Market, being subject to a demanding boss and demanding expectations is not sufficient to constitute a violation of Title VII. *Duhe' v. United States Postal Serv.*, No. 03-746, at *22 (E.D. La. Mar. 8, 2004) (citing *Webb v. Cardiothoracic Sur. Ass'n of N. Tex.*, 139 F.3d 532, 539 (5th Cir. 1998)).

---

[15] Because Mr. Booth fails to make out a *prima facie* case by pointing to a valid comparator, the burden does not shift to Wal-Mart, and the analysis on this claim is concluded.

FPDOCS 30934382.1

Moreover, Mr. Booth offers nothing to evidence that Wal-Mart's legitimate, non-discriminatory reason for engaging in frequent store visits is pretextual. As a result, this aspect of Mr. Booth's discrimination claim cannot survive summary judgment.

### C. Mr. Booth's claim for hostile work environment fails as a matter of law.

#### 1. Mr. Booth failed to exhaust his administrative remedies.

It should first be noted that Mr. Booth failed to exhaust his administrative remedies with regard to his hostile work environment claim, as he did not advance any type of hostile work environment claim in his charge of discrimination. **Exhibit 18**. It is well-settled that federal courts lack jurisdiction to consider Title VII claims unless there is administrative exhaustion. *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006). Generally this requires a party to present the claim to the EEOC. *Id.* In Mr. Booth's charge, he checked the boxes for discrimination based on race and retaliation. **Exhibit 18**. His statement of particulars offered no basis for a hostile work environment claim, however. In short, nothing on the face of Mr. Booth's charge suggests that the EEOC investigated a hostile work environment claim. Under these facts, a race-based hostile work environment claim cannot grow from his race-based disparate treatment claim. *See e.g., Swanier v. Home Depot U.S.A., Inc.*, 2:05CV2071-LG-JMR, at *3 (S.D. Miss. Dec. 5, 2007) (holding that a hostile work environment charge cannot reasonably be expected to grow out of an EEOC charge alleging discrimination based on race)

#### 2. Mr. Booth failed to identify any objectively harassing conduct.

In the event the Court finds that Mr. Booth exhausted his administrative remedies, his race-based hostile work environment claim must still fail. To establish a *prima facie* case of race discrimination creating a hostile work environment, Mr. Booth must show: (1) that he belongs to a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment

12

was based on race; and (4) that the harassment affected a term, condition, or privilege of employment. *See Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). "For harassment on the basis of race to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (internal quotations omitted). To constitute "severe or pervasive" harassment, the conduct complained of must be both subjectively perceived as abusive by the plaintiff and objectively hostile or abusive under a reasonable person standard. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). In making that determination, courts are instructed to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey*, 286 F.3d at 268. Finally, general allegations of discrimination or harassment should not be considered; instead, a court should only consider specific allegations. *Mosley v. Marion County, Miss.*, 111 Fed. App'x. 726, 728 (5th Cir. 2004) (refusing to consider general allegations of discrimination); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1049 (5th Cir. 1996) (finding that a general allegation of racist remarks was insufficient to establish *prima facie* claim of hostile work environment).

In his Amended Complaint, Mr. Booth generally alleges that he was subjected to "racially motivated harassment" and "racially hostile work conditions." **ECF No. 3**. But, at his deposition, he identified only three specific comments that he believed were "racially tinged."[16] **Exhibit 1, pp. 41-46**.

---

[16] He testified that he could not recall any other comments that he believed had racial overtones. **Exhibit 1, p. 46**.

First, Mr. Booth described a lunch meeting where an African-American male was being interviewed for a position. **Exhibit 1, pp. 42-44**. According to Mr. Booth, Mr. Spencer asked the interviewee if he believed that he "would ever make the kind of money" that he was making. Mr. Booth testified that he felt like the question was inappropriate and that it had racial overtones to it due to Mr. Spencer's tone of voice. Mr. Booth offered no other details as to why he believed Mr. Spencer's comment to be racially-charged. Second, he testified that Mr. Sappington told him "you've got an easy sales plan, and if I ever become your supervisor, that won't happen again." **Exhibit 1, p. 44**. Mr. Booth conceded that he did not believe the comment had racial overtones to it when it was made. Instead, he attributed racial overtones to it later because his sales plan for the next year was "pretty tough," and he believed that the implementation of such a plan was unfair. **Exhibit 1, p. 44**. Finally, Mr. Booth testified the third comment came on the heels of his first coaching. **Exhibit 1, pp. 44-45**. He testified that Mr. Sappington "laughed in [his] face" when he recounted Tracey Rosser saying, "I can't believe it took you [i.e., Mr. Sappington] that long to coach him."

A Title VII plaintiff is required to show that his hostile work environment claim is based on race. *See Ramsey*, 286 F.3d at 268. None of the above-comments rise to the level of unwelcome harassment based on Mr. Booth's race, however – even construing all facts and inferences in the light most favorable to Mr. Booth. In fact, it is unclear whether Mr. Booth believes that they do. Nonetheless, it is difficult to discern how the comments Mr. Booth described are objectively harassing or even race-related. No racial slurs were used against Mr. Booth and no comments were charged with the requisite racial hostility. Further, Mr. Booth makes no showing that the purportedly hostile comments affected terms or conditions of his employment. Thus, summary judgment as to Mr. Booth's hostile work environment claim is

14

warranted. *See e.g., Cavalier v. Clearlake Rehab. Hosp., Inc.*, No. H-07-678, at *5-6 n. 6 (S.D. Tex. May 12, 2008) (finding comments that do not implicate racial animus through words or conduct do not trigger the protections of Title VII); *Graham v. Memorial Health Univ. Med. Ctr.*, No. CV411-316, *19 (S.D. Ga. Sept. 30, 2013) (finding that minor and tangential references to a plaintiff's race do not suffice for purposes of showing a hostile work environment);

> **D. Mr. Booth's claim for retaliation fails as he is unable to show that he engaged in any protected activity.**

The anti-retaliation provision of Title VII prohibits employers from discriminating against employees on the basis that the individual opposed a practice made unlawful by Title VII or made a charge, testified, assisted, or participated in an investigation or proceeding under Title VII. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (citing 42 U.S.C. § 2000e-3(a)). For a plaintiff to make out a *prima facie* case of retaliation, he must show that: (1) he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Hague v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 560 F. App'x. 328, 333 (5th Cir. 2014).

Once an employee establishes his *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its decision. After, the burden shifts back to the employee to demonstrate why the employer's reason is actual a pretext for retaliation. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388-89 (5th Cir. 2007). "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Mr. Booth states in his Amended Complaint that he complained of racial discrimination to the home office in Bentonville, Arkansas. **ECF No. 3**. As a result of purportedly engaging in this activity, he submits that he was retaliated against. Specifically, Mr. Booth alleges that his supervisors (i.e., Mr. Spencer and Mr. Sappington) retaliated against him by targeting the stores with African-American Store Managers, subjecting him to coachings, constructively discharging him, and that he was denied an interview for the position of Health and Wellness director after he applied. **ECF No. 3**. Mr. Booth's deposition testimony, however, belies the allegations of his Amended Complaint.

Wal-Mart maintains both an Anti-Discrimination and Harassment Policy and an Open Door Policy. **Exhibit 4; Exhibit 21**. Mr. Booth was trained on both. **Exhibit 1, pp. 85-86**. Over the course of his employment with Wal-Mart, Mr. Booth utilized the Open Door process twice. He first used the Open Door Policy after he was placed on a PIP in May 2012. **Exhibit 1, pp. 86-88**. In doing so, he complained to Mr. Sappington's direct supervisor, Divisional Vice President Tracey Rosser, that the PIP was vague. **Exhibit 1, p. 86**. At no point did Mr. Booth express any concern that he felt like the PIP was implemented because of his race. **Exhibit 1, pp. 89-90**. Moreover, Mr. Booth admitted that he felt that his complaint about the vagueness of his May 2012 PIP was resolved in his favor and to his satisfaction. **Exhibit 1, pp. 92-93.** Later, around February 2013, Mr. Booth "open-doored" a coaching to the Business Unit Vice President of Human Resources.[17] **Exhibit 1, p. 106**. Mr. Booth admitted that he did not

---

[17] While Mr. Booth contends the March 2013 PIP was issued because he "open-doored" the February 2013 coaching, this contention cannot support a retaliation cause of action because Mr. Booth concedes he did not complain in February 2013 that he felt like he was being coached in February 2013 because of his race. **Exhibit 1, pp. 110-11**. Therefore, Mr. Booth did not engage in a protected activity under Title VII. *See Burlington*, 548 U.S. at 56 (citing 42 U.S.C. § 2000e-3(a)).

16

complain that he felt like he was being coached because of his race. **Exhibit 1, p. 107**. In fact, Mr. Booth admitted that he *never* complained to anyone through the Open Door process that he felt like he was being coached or held accountable because of his race. **Exhibit 1, pp. 112, 134-135**. One deposition exchange sums up the retaliation issue:

> Q. Let me go back. When you open-doored, Mr. Booth, let me make sure this is absolutely clear. When you open-doored to anybody through the open-door process, did you ever complain to anybody and said, "Look, I'm getting held accountable and being issued PIPs and warning notices, and I think it's because of my race."?
>
> A. No, sir.

**Exhibit 1, p. 112.**

On June 17, 2013, Rafael Brown (African American), a Market Human Resources Manager, utilized the Open Door process and complained that he believed the regional team was discriminating against African-American Store and Market Managers. **Exhibit 22**. As part of the investigation into Mr. Brown's allegations, Mr. Booth was interviewed on July 24, 2013. During that interview, Mr. Booth specifically stated that he did not believe Mr. Sappington visited stores because of the race of the Store Managers or that "Sammy is discriminatory in any way regarding ethnicity or race." Thus – toward the end of his tenure with Wal-Mart – Mr. Booth was specifically asked whether he believed he was being discriminated against based on his race, and he said no.

It is clear that, despite the allegations in his Amended Complaint, Mr. Booth never engaged in protected activity within the ambit of Title VII.[18] As a result, a retaliation cause of action cannot survive and summary judgment is warranted.

---

[18] Because Mr. Booth fails to demonstrate that he engaged in protected activity within the ambit of Title VII, a requirement of his *prima facie* case, there is no need to show a lack of causal

17

E.  **Mr. Booth's claim for constructive discharge fails because he voluntarily left his employment with Wal-Mart and he did not experience intolerable working conditions.**

"A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 (5th Cir. 2001). Courts consider a variety of factors in determining whether a constructive discharge occurred: (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a different supervisor; (6) badgering harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *See Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 444 (5th Cir. 2011). This analysis asks whether a reasonable person in the plaintiff's shoes would have felt compelled to resign. *McCoy v. Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Constructive discharge requires "a 'greater severity of pervasiveness or harassment than the minimum required to prove a hostile work environment.'" *Dediol*, 655 F.3d at 378.

Mr. Booth alleges that his working conditions were so intolerable that Wal-Mart constructively discharged him. **ECF No. 3**. Mr. Booth's constructive discharge allegation is scant on specifics and he offers nothing to evidence that he (1) was demoted; (2) experienced a reduction in salary; (3) experienced a reduction in job responsibility; (4) was reassigned to perform menial or degrading work; (5) was reassigned to work under a different supervisor; or (6) experienced harassment or humiliation calculated to encourage his resignation. While Mr. Booth was invited to step down to a Store Manager, this invitation was extended due to Mr.

---

connection between any complaints and purportedly adverse employment action to which Mr. Booth may have been subjected.

Booth's continued substandard performance as a Market Manager and was suggested as a way to give Mr. Booth the much-needed retail experience he lacked. **Exhibit 2**.

More telling, however, is Mr. Booth's deposition testimony. Mr. Booth testified that his separation from employment was a voluntary one and that he "voluntarily quit." **Exhibit 1, p. 125**. In fact, Mr. Booth testified that he would have stayed with Wal-Mart if he could have found another position. **Exhibit 1, p. 142**. When pressed about the purportedly intolerable working conditions he suffered, he testified only that "no day of the week was mine. There was no home life for me because I was always on edge about coming in every weekend because [Mr. Spencer] had a tendency to visit only on the weekends." **Exhibit 1, pp. 131-132**. Mr. Booth was unable to offer any other details as to the intolerable working conditions he claims he experienced. **Exhibit 1, pp. 132-33**. As noted above, simply that a plaintiff has a demanding boss does not implicate Title VII by itself. *See Duhe'*, No. 03-746, at *22 (citing *Webb*, 139 F.3d at 539). For these reasons, Mr. Booth's constructive discharge claim falls well short of what is required under Circuit precedent, and therefore fails as a matter of law.

### III. CONCLUSION

For the foregoing reasons, Wal-Mart respectfully requests that the Court grant its Motion for Summary Judgment and find that there is no genuine dispute as to any material fact concerning any of Mr. Booth's claims.

DATED, this the 13th day of August, 2015.

Respectfully submitted,

s/Jaklyn Wrigley
Jaklyn Wrigley (MSB #103773)

Jaklyn Wrigley (MSB #103773)
Steven R. Cupp (MSB #99975)
Fisher & Phillips LLP
2505 14th Street, Suite 300
Gulfport, MS 39501
Phone: 228-822-1440
Facsimile: 228-822-1441
scupp@laborlawyers.com
jwrigley@laborlawyers.com

**CERTIFICATE OF SERVICE**

I, Jaklyn Wrigley, of the law firm of Fisher & Phillips, LLP, do hereby certify that I have filed the foregoing with the Clerk of Court utilizing the ECF-System which sent a copy of same to the following:

Louis H. Watson, Jr., Esq.
Nick Norris, Esq.
WATSON & NORRIS, PLLC
1880 Lakeland Drive, Suite G
Jackson, Mississippi 39216
Tel: (601) 968-0000
Fax: (601) 968-0010

DATED, this the 13th day of August, 2015.

s/Jaklyn Wrigley
Jaklyn Wrigley, Esq.